UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| APRIL PALMER,<br><br>          Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>          Defendant. | CASE NO. 1:25-CV-00135-BYP<br><br>JUDGE BENITA Y. PEARSON<br><br>MAGISTRATE JUDGE DARRELL A. CLAY<br><br>REPORT AND RECOMMENDATION |

### INTRODUCTION

Plaintiff April Palmer challenges the Commissioner of Social Security's decision denying disability insurance benefits (DIB) and supplementary security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter was referred to me under Local Civil Rule 72.2 to prepare a Report and Recommendation. (Non-document entry dated Jan. 27, 2025). For the reasons below, I recommend the District Court **AFFIRM** the Commissioner's decision.

### PROCEDURAL BACKGROUND

Ms. Palmer applied for DIB and SSI on January 14, 2019. (Tr. 205, 212). For both applications, she alleged she became disabled on June 11, 2018 due to fibromyalgia, arthritis, degenerative disc disease, depression, anxiety, high blood pressure, cholesterol, and gastroesophageal reflux disease. (Tr. 135, 138, 205, 212). After the claims were denied initially and on reconsideration, Ms. Palmer requested a hearing before an administrative law judge. (Tr. 135,

1

138, 147, 154, 159). On May 22, 2020, Ms. Palmer (represented by counsel) and a vocational expert (VE) testified before the ALJ. (Tr. 39-78). On June 2, 2020, the ALJ determined Ms. Palmer was not disabled. (Tr. 15-28). On January 14, 2021, the Appeals Council denied Ms. Palmer's request for review. (Tr. 1-3). Ms. Palmer sought judicial review on March 10, 2021. (Tr. 777-78). Ms. Palmer and the Commissioner agreed to a stipulated remand and so the court remanded the matter for further proceedings. (Tr. 795-96; *see also Palmer v. Comm'r of Soc. Sec.*, No. 1:21-cv-00560-PAG (N.D. Ohio Jan. 6, 2022)).

On remand, the Appeals Council ordered the ALJ to re-evaluate the medical opinion of Dr. Lavinia Cozmin, reassess Ms. Palmer's residual functional capacity (RFC), and obtain supplemental testimony from the VE if needed. (Tr. 799-800). By the time the Appeals Council issued its order on August 13, 2022, Ms. Palmer had filed a second application for DIB and SSI and was found disabled as of June 3, 2020, so the ALJ's review was limited to the period before June 3, 2020. (Tr. 800).

On January 24, 2023, Ms. Palmer (represented by new counsel) and a VE testified before the same ALJ. (Tr. 713-49). On January 27, 2023, the ALJ determined Ms. Palmer was not disabled from June 11, 2018 to June 3, 2020. (Tr. 692-706). On August 24, 2023, the Appeals Council denied Ms. Palmer's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 682-85; *see also* 20 C.F.R. §§ 404.981, 416.1481). On January 27, 2025, Ms. Palmer timely filed this action. (ECF #1; *see also* Tr. 677).

## FACTUAL BACKGROUND

### I. Personal and Vocational Evidence

Ms. Palmer was 55 years old on her alleged onset date and 60 years old at the second hearing. (*See* Tr. 79, 721-22). She has attended college, but did not complete her degree. (Tr. 722).

She has past relevant work experience as a housekeeping cleaner, customer-service representative, and lathe operator. (Tr. 72-73, 743).

## II.     Relevant Medical Evidence[1]

On January 31, 2018, Ms. Palmer visited her regular treating physician, Lavinia Cozmin, M.D., for hypertension, muscle pain, and depression. (Tr. 409, 541). Her pain was described as severe and present in her neck, legs, feet, and lower back. (Tr. 542). Ms. Palmer returned to Dr. Cozmin in April 2018 where her medications were adjusted with instructions to follow up in June. (Tr. 552, 559-60).

In June 2018, Ms. Palmer followed up as instructed and complained that her arthralgia (joint pain) and myalgia (muscle pain) had worsened. (Tr. 388, 564). Her pain was described as constant, severe, aching, and continuing despite multiple medications. (*Id.*). She was diagnosed with joint pain in multiple sites and fibromyalgia. (Tr. 391, 569). A physical examination yielded positive findings for arthralgias, joint swelling, myalgias, neck stiffness, dysphoric mood, and sleep loss while all other findings were negative. (Tr. 390, 567). Ms. Palmer also had normal range of motion in her wrists and cervical back region, but exhibited decreased range of motion and tenderness in her thoracic and lumbar regions. (Tr. 391, 568). She was referred for X-ray imaging and for pain-management care with instructions to follow up next month. (Tr. 392, 570).

Ms. Palmer began pain-management care for her shoulder, lower-back, and hip pain in June 2018. (Tr. 380-81). Her pain was described as a constant aching, ranging from a nine out of ten to a ten out of ten on the pain scale, being located more in her back than legs and worse with activity. (Tr. 381). A physical examination found she had no difficulty standing, normal gait,

---

[1]     Because the ALJ's review was limited to the period of June 11, 2018 to June 2, 2020 (*see* Tr. 718, 800), I too limit my discussion of the medical record to the same period.

3

limited range of motion and tenderness in her lumbar spine, and normal strength and reflexes. (Tr. 383-84). She was prescribed non-opioid pain medication, muscle relaxers, physical therapy, and home exercises. (*See* Tr. 385-87). X-ray imaging of her spine was ordered. (Tr. 386).

In July 2018, Ms. Palmer received bilateral corticosteroid injections in her hips. (Tr. 378). She followed up in August with her pain-management physician and reported the injections provided "greater than 50% pain relief" and "[s]he wishe[d] it lasted longer." (Tr. 366). She reported neck, lower-back, hand, and shoulder pain that worsened with lifting objects and caring for her son. (Tr. 366-67). A physical examination found normal gait, a decreased range of motion in both shoulders, and four-out-of-five strength in her arms and grip. (Tr. 369). Ms. Palmer's prescriptions were increased. (Tr. 371). Although additional injections were recommended, her insurance provider refused to pay for them unless she first completed six weeks of physical therapy (which she had not pursued since the June referral).[2] (Tr. 365, 368).

In October 2018, Ms. Palmer followed up with Rebecca Suit, APRN, a certified nurse practitioner at her pain-management provider. (Tr. 358). There, Ms. Palmer reported she could not complete physical therapy because she fell and injured her foot. (Tr. 360, 363). A physical examination found intact sensation, a decreased range of motion and tenderness in the lower back, and negative straight leg raises. (Tr. 361). Nurse Suit noted Ms. Palmer could briefly heel walk and toe walk and her "strength, balance, and coordination are functional for ambulation." (*Id.*). Her medications were continued because they helped her function with her activities of daily living and improved her quality of life. (Tr. 362).

---

[2] Ms. Palmer later explained in the 2023 administrative hearing that she previously had tried physical therapy but without success. (*See* Tr. 728).

4

Ms. Palmer returned for a follow-up pain-management visit in November 2018. (Tr. 352). An examination found back and neck pain with a limited range of motion in her shoulders. (Tr. 355). Her pain was better with rest and worse with activity and caring for her son. (Tr. 353). A cervical spine MRI taken that month revealed degenerative disc disease and facet arthropathy and narrowing between the C5-6 and C6-7 vertebrae. (Tr. 532). At a follow-up visit in December 2018, she reported her pain persisted although her medications helped her remain "functional" with chores, home exercises, and activities of daily living. (Tr. 344). She reported "greater than 50% pain relief without any significant side effects." (*Id.*). Her pain medications were increased. (Tr. 348). She reported similar results for her medications in January 2019. (Tr. 528, 664).

In February 2019, Ms. Palmer returned to Dr. Cozmin. (Tr. 574, 610). In that visit, Ms. Palmer reported she was the main caregiver for her disabled son. (*Id.*). A physical examination found arthralgias, back pain, myalgias, neck pain, tenderness in her cervical back, and a normal range of motion. (Tr. 578-79, 613).

In May 2019 follow-up visit to her pain-management provider, Ms. Palmer reported having worsened pain. (Tr. 602, 655). She reported her pain persisted although her medications helped her remain "functional" with chores, home exercises, and activities of daily living. (*Id.*). She reported "greater than 50% pain relief without any significant side effects." (*Id.*). She had not attended physical therapy. (*Id.*).

Ms. Palmer returned to Nurse Practitioner Suit in June 2019 for her back and neck pain. (Tr. 594, 647). She rated her pain at four out of ten with medication and at seven out of ten without medication. (Tr. 596, 651). Her pain worsened when sitting too long and improved with lying down. (*Id.*). A physical examination found intact sensation, tenderness to palpation, and

5

decreased range of motion in her back. (Tr. 597, 651-52). She was aware she needed to complete physical therapy for her insurance to cover MRIs and that she had not done so. (Tr. 597, 653). Ms. Palmer was continued on her medications. (*Id.*). X-ray imaging of her cervical and lumbar spine taken that month found in the cervical spine "mild mid/distal arthritis [and] relatively normal anatomic alignment" and in the lumbar spine "thoracolumbar and lumbosacral arthritis" and "mild superior central end plate depression primarily involving L2" vertebra. (Tr. 676).

The last medical record within the relevant period is from March 2020 where Ms. Palmer experienced severe neck pain and went to the emergency department on advice from her family physician. (Tr. 1065-66). She reported having "chronic neck problems and was initially followed by neuro spine care" that "did not do anything for her ongoing neck pain, therefore she fired them and has not rescheduled with anyone else." (Tr. 1066). An X-ray of Ms. Palmer's cervical spine revealed her "cervical vertebral body heights and intervertebral disc spaces are preserved" and "[n]o fracture or spondylolisthesis" but also "[m]ultilevel mild degenerative plate changes with spurring." (*See* Tr. 1075). The radiologist concluded Ms. Palmer had "[d]egenerative changes of the cervical spine without acute fracture or malalignment." (*Id.*).

### III. Relevant Opinion Evidence

On April 2, 2019, state agency medical consultant Bradley Lewis, M.D., evaluated Ms. Palmer as part of the initial evaluation of her disability applications. (Tr. 88-90, 102-04). Dr. Lewis opined Ms. Palmer can lift and carry 20 pounds occasionally and 10 pounds frequently; stand, walk, or sit for about six hours of an eight-hour workday; occasionally climb ladders, ropes, or scaffolds; and frequently stoop and crouch, occasionally crawl, and occasionally reach overhead. (*Id.*). On April 11, 2023, state agency medical consultant Maureen Gallagher, D.O., affirmed the findings on reconsideration. (Tr. 117-20, 129-31).

6

On April 14, 2020, Lavinia Cozmin, M.D., Ms. Palmer's treating physician, completed a medical opinion form. (Tr. 633). Dr. Cozmin opined Ms. Palmer can lift and carry 10 pounds occasionally and less than 10 pounds frequently; can stand and walk for less than two hours and sit for two hours in an eight-hour workday; must be free to shift between sitting, standing, and walking at will; will need to lie down at unpredictable times; and will be absent from work due to her condition and treatment more than four times a month. (*Id.*).

**IV.     Relevant Testimonial Evidence**

Ms. Palmer explained she could not work because of the pain. (Tr. 723). The most work she could do was temporary employment because for each day she worked, she needed between two and four days to recover. (*Id.*). At her last job working on a factory production line, she would leave work and be barely able to get into her house to rest. (Tr. 726). Once she laid down, it was too painful for her to get up, even to use the restroom. (*Id.*). The day after working, her hands would swell to softball size and go numb such that she could not close her hands or move her fingers. (*See* Tr. 726-27, 741). Her neck pain also prevents her from lifting her arm. (Tr. 741). While working, she often took short-term disability or medical leave for her absences to recover. (Tr. 737). While her medications would relieve her pain, they also caused extreme drowsiness and even suicidal ideation. (*See* Tr. 729, 733).

Ms. Palmer lives with and cares for her disabled adult son. (Tr. 720-21). Her son is bedridden and lies in a special bed with an electric motor to rotate him to avoid bed sores. (Tr. 735-36). Except during the COVID-19 pandemic, professional caregivers would help care for her son. (Tr. 739). Her daughter also helps Ms. Palmer care for her son. (Tr. 732).

7

She could shop for groceries, though it takes her days to recover from the resulting pain. (Tr. 732-33). The same situation would happen if she cleaned the floors or did yard work, so she relied on her family or neighbors for help with household chores. (Tr. 734-35, 738-39).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A).

The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine whether a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, which is "severe," defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering his or her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to prove whether the claimant has the RFC to perform available work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past work experience to determine whether the claimant could perform other work. *Id.* Only if a

8

claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is the claimant deemed disabled. 20 C.F.R. §§ 405.1520(b)-(f), 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

### THE ALJ'S DECISION

At Step One, the ALJ determined that while Ms. Palmer had worked during June 11, 2018 to June 2, 2020, the work did not constitute "substantial gainful activity." (Tr. 695). At Step Two, the ALJ identified "spine disorders and dysfunction of major joints" as severe impairments. (*Id.*). At Step Three, the ALJ found Ms. Palmer's impairments did not meet or medically equal the requirements of a listed impairment. (Tr. 697). At Step Four, the ALJ determined Ms. Palmer had the RFC "to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) except occasional climbing of ladders, ropes, or scaffolds; frequent stooping and crouching; occasional crawling; and occasional bilateral overhead reaching." (Tr. 698). The ALJ then concluded Ms. Palmer could perform her past relevant work as a housekeeping cleaner, customer service representative, and lathe operator. (Tr. 705). Because the ALJ found Ms. Palmer not disabled at Step Four, the ALJ did not reach Step Five. Thus, the ALJ concluded Ms. Palmer was not disabled from June 11, 2018 through June 2, 2020. (Tr. 706).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters*, 127 F.3d at 528. The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833

(6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence" is "more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). But "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F.App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether substantial evidence supports the Commissioner's findings, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence (or indeed a preponderance of the evidence) supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Apart from considering whether substantial evidence supports the Commissioner's decision, the court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. *Walters,* 127 F.3d at 528. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

10

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); *accord Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.").

## DISCUSSION

Ms. Palmer argues the ALJ did not properly analyze Dr. Cozmin's medical opinion because the ALJ relied on evidence that on close examination actually supports the opinion and the ALJ improperly assessed her daily activities and treatment. (*See* ECF #9 at PageID 1137, 1139-43). The Commissioner responds that the ALJ applied the supportability and consistency factors to evaluate Dr. Cozmin's opinion and substantial evidence supports those findings. (*See* ECF #11 at PageID 1155-58).

At Step Four, the ALJ determines a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. §§ 404.1520(e), 416.920(e). As part of that assessment, the ALJ must review all medical source opinions and prior administrative findings. *See* 20 C.F.R. §§ 404.1520c(b), 416.920c(b); *see also Reeves v. Comm'r of Soc. Sec.*, 618 F.App'x 267, 275 (6th Cir. 2015). The ALJ must determine the persuasiveness of a medical source's opinion using a five-factor analysis: (1) supportability; (2) consistency; (3) relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors that tend to support or contradict a medical opinion. 20 C.F.R. §§ 404.1520c(c)(1)-(5), 416.920c(c)(1)-(5). Supportability and

11

consistency are the most important factors the ALJ considers and the ALJ must explain how he considered them in the written decision. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2); *see also Palmore v. Comm'r of Soc. Sec.*, No. 1:20-cv-36, 2021 WL 1169099, at *4 (S.D. Ohio Mar. 29, 2021). The ALJ "may, but [is] not required to, explain" how the ALJ considered the relationship, specialization, and any other factors. *Id.* If the ALJ discusses both the supportability and consistency factors and that discussion is supported by substantial evidence, the Court may not disturb the ALJ's findings. *Paradinovich v. Comm'r of Soc. Sec.*, No. 1:20-cv-01888, 2021 WL 5994043, at *7 (N.D. Ohio Sept. 28, 2021), *report and recommendation adopted,* 2021 WL 5119354 (N.D. Ohio Nov. 4, 2021).

As mentioned above, Dr. Cozmin opined in April 2020 that Ms. Palmer can lift and carry no more than 10 pounds; can stand, sit, or walk for no more than two hours in an eight-hour workday; must be free to shift between sitting, standing, and walking and be able to lie down at unpredictable times; and will be absent from work more than four times a month. (Tr. 633).

The ALJ first assessed the opinion's supportability, defined as "the extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation." *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 F.R. 5844-01, 2017 WL 168819 (Jan. 18, 2017). The ALJ analyzed this factor as follows:

> Dr. Cozmin's medical opinion of such severe and extreme limitations is not persuasive because it is not fully supported by the objective medical evidence. While the physical examinations, including those by Dr. Cozmin, show some abnormal findings (most often, there was tenderness to palpation of the lumbar and cervical back and decreased range of motion of the lumbar and cervical back), the physical examinations also show "normal" coordination, a non-antalgic gait, and good strength including grip and grasp strength. Significantly, Ms. Suit documented that the claimant's strength, balance, and coordination were "functional" for ambulation and her strength was "functional" in the upper extremities. While the objective

12

> medical evidence warrants some limitations, it does not support the severe and extreme limitations expressed by Dr. Cozmin.

(Tr. 702) (cleaned up).

Here, substantial evidence supports the ALJ's conclusion. The findings yielded by Dr. Cozmin's examinations of Ms. Palmer found tenderness to palpation in both her lumbar and cervical back but also a normal range of motion in the cervical back. (*See* Tr. 390-91, 567-68, 579, 613). One examination found a reduced range of motion in the thoracic and lumbar regions of the back, but not the cervical region. (Tr. 391). Nurse Suit's examination of Ms. Palmer in October 2018 found intact sensation, decreased range of motion and tenderness in the lower back, and negative straight leg raises. (Tr. 361). Nurse Suit also noted Ms. Palmer could briefly heel walk and toe walk and her "strength, balance, and coordination are functional for ambulation." (*Id.*). Nurse Suit's June 2019 examination found intact sensation, tenderness to palpation, and decreased range of motion in Ms. Palmer's back. (Tr. 597, 651-52). The examinations by Sunjay Mathur, M.D. (Nurse Suit's colleague in pain management), had similar findings of normal gait, strength, grip, and reflexes; limited range of motion; and tenderness to palpation. (*See* Tr. 369, 383-84). Though the examinations were performed at different times, these findings are substantial evidence that Ms. Palmer is not as limited as Dr. Cozmin opined.

Ms. Palmer argues "the office note of November 2, 2018 from Dr. Mathur" that the ALJ cited actually supports Dr. Cozmin's opinion because it "reveals that Plaintiff was taking Gabapentin with only minimal relief." (ECF #9 at PageID 1139). True enough, but not complete. Two sentences after that quotation, Dr. Mathur notes Ms. Palmer was also taking Tizanidine and Cymbalta and they "help[ed] with performing activities of daily living, compliance with home

13

exercise program, and maintaining her quality of life."³ (Tr. 351). That one of Ms. Palmer's three pain medications has minimal effectiveness does not mean the other two are also not effective. And Ms. Palmer reported in both December 2018 and January 2019 that her medication regimen overall gave "greater than 50% pain relief without any significant side effects." (Tr. 344, 528, 664).

Ms. Palmer also points to her ongoing pain that improves with rest, decreased range of motion, home exercise program, paresthesia in the left leg, and four-out-of-five strength as supporting Dr. Cozmin's opinion that she cannot stand or walk for long periods. (ECF #9 at PageID 1139-40). But the court cannot reweigh the medical evidence that supports and detracts from Dr. Cozmin's medical opinion and come to a different conclusion than the ALJ. *See Brainard*, 889 F.2d at 681. The court's review is limited to whether the ALJ discusses the regulatory factors, and the discussion is supported by substantial evidence. *See Paradinovich*, 2021 WL 5994043, at *7.

The second factor for analyzing a medical opinion is an opinion's "consistency," defined as "the extent to which the opinion is consistent with evidence from other medical sources and nonmedical sources in the claim." *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 F.R. 5844-01, 2017 WL 168819 (Jan. 18, 2017). The ALJ analyzed this factor as follows:

> Dr. Cozmin's medical opinion of such severe and extreme limitations is not persuasive because it not consistent with the limited course of treatment or the following notations: as recounted above, on October 9, 2018, Ms. Suit continued the claimant's medications for chronic pain (Tizanidine, Cymbalta, and Gabapentin)

---

³ Gabapentin, Tizanidine, and Cymbalta are each medications prescribed to treat joint pain, neuropathic pain, and pain from muscle spasms. Gabapentin is an anticonvulsant also used to relieve the pain of postherpetic neuralgia. *See Gabapentin*, *MedlinePlus*, http://medlineplus.gov/druginfo/meds/a694007.html (last accessed Nov. 17, 2025). Tizanidine is a skeletal muscle relaxant used to relieve muscle spasms, cramping, and tightness. *See Tizanidine*, *MedlinePlus*, http://medlineplus.gov/druginfo/meds/a601121.html (last accessed Nov. 17, 2025). Cymbalta is a brand name for duloxetine, a medication that can be used to treat pain and tingling caused by fibromyalgia. *See Duloxetine*, *MedlinePlus*, http://medlineplus.gov/druginfo/meds/a604030.html (last accessed Nov. 17, 2025).

> since they helped the claimant "function" with activities of daily living and improved her quality of life. On November 2, 2018, Dr. Mathur noted that the claimant's Tizanidine and Cymbalta "helped" the claimant with performing activities of daily living, compliance with her home exercise program, and maintaining her quality of life. On June 6, 2019, the claimant saw Ms. Suit about her chronic low back and neck pain. The claimant felt that her medications helped her to "function" and improved her quality of life. As recounted above, in March 2020, the claimant's medications included Tizanidine, Cymbalta, Mobic, and Lidocaine cream, prescribed by Dr. Cozmin. Although the claimant presented at the Emergency Department on March 17, 2020, for treatment of severe neck pain, her severe neck pain had only started two days earlier. Dr. Cozmin's medical opinion of such severe and extreme limitations is not persuasive because it is not consistent with the claimant's activities of daily living. On February 12, 2019, the claimant told Dr. Cozmin that she remained the "main caregiver" for her disabled son. On March 15, 2019, the claimant reported that she took care of her disabled son and "I do everything for him."

(Tr. 702-03) (citations omitted).

Substantial evidence again supports the ALJ's conclusions. The ALJ characterized Ms. Palmer's treatment as "limited." Ms. Palmer has been treated primarily through medication and injections. Such treatment modalities have been characterized as "conservative" and suggests a claimant's pain is less than disabling. *See, e.g.*, *Adams v. Comm'r of Soc. Sec.*, No. 23-3284, 2023 WL 6366106, at *3 (6th Cir. Sept. 28, 2023) (characterizing "epidural injections, medial-branch blocks, and prescription pain medication" as "conservative treatment" for degenerative disc disease). As mentioned above, Ms. Palmer reported her medications provide "greater than 50% pain relief without any significant side effects" suggesting that conservative treatment was yielding results. (*See* Tr. 344, 351, 528, 664).

Ms. Palmer argues that contrary to the ALJ's conclusion, Dr. Cozmin's opinion is consistent with Ms. Palmer's activities of daily living. (*See* ECF #9 at PageID 1140-41). But Ms. Palmer's March 2019 Adult Function Report listed she "did everything for" her disabled son, cared for two service dogs, drove, shopped for groceries, and prepared meals. (Tr. 281-83). Ms.

15

Palmer argues "the fact that a mother has to help her son (often with help of others) does not equate to a finding that she can also perform the demands of light work and is certainly not a reason to reject the opinion of a treating physician." (ECF #9 at PageID 1141). But the ALJ did not find Ms. Palmer's ability to complete daily activities meant that she could perform light work; rather the ALJ determined that those activities suggested Ms. Palmer was not as limited as Dr. Cozmin opined. And a medical opinion's consistency with other evidence in the record, like activities of daily living, is one factor in assessing a medical opinion.

Ms. Palmer also argues that the ALJ erroneously rejected Dr. Cozmin's opinion based on "objective medical evidence, including the signs and laboratory findings, and the course of treatment in this case," and because Ms. Palmer "was clearly more active and more capable than alleged." (*See* ECF #9 at PageID 1141-43). Ms. Palmer also argues the ALJ's logic was faulty by finding Ms. Palmer sought medical care on a "somewhat regular basis" but then found she "did not require or receive frequent care for any medical condition." (*Id.* at PageID 1142). But all these arguments confuse the ALJ's evaluation of Ms. Palmer's subjective statements of her symptoms as analysis of Dr. Cozmin's opinion. The two paragraphs that contain the findings Ms. Palmer complains of do not mention Dr. Cozmin's opinion and both conclude "I find the claimant's symptoms and limitations were not as severe as alleged." (*See* Tr. 704). Thus, these findings have no bearing on the ALJ's analysis of Dr. Cozmin's opinion.

Ms. Palmer concludes by arguing that under her application of the regulatory factors, Dr. Cozmin's opinion was supported by and consistent with the evidence and Dr. Cozmin's treating relationship further suggested the opinion is persuasive. (*See* ECF #9 at PageID 1143-46). But the court cannot perform an independent reweighing of the regulatory factors and reach a different

16

conclusion than the ALJ. *See Brainard*, 889 F.2d at 681. The court's review is limited to whether the ALJ discusses the regulatory factors and whether the discussion is supported by substantial evidence. *See Paradinovich*, 2021 WL 5994043, at *7. To show a lack of substantial evidence, Ms. Palmer must do more than "point[] to evidence of the record that supports her position." *Greene ex rel. Greene v. Astrue*, No. 1:10-cv-0414, 2010 WL 5021033, at *4 (N.D. Ohio Dec. 3, 2010). Rather, Ms. Palmer must show that "there is not sufficient evidence in the record that would allow a reasoning mind to accept the ALJ's conclusion." *Id.* A reasoning mind, viewing Dr. Cozmin, Dr. Mathur, and Nurse Suit's treatment notes together with Ms. Palmer's reported daily activities, could accept the ALJ's conclusion that Dr. Cozmin's opinion was neither supported by, nor consistent with, that evidence and those factors outweighed Dr. Cozmin's treating relationship with Ms. Palmer.

## CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I recommend the District Court **AFFIRM** the Commissioner's decision denying supplemental security income.

Dated: November 17, 2025

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

OBJECTIONS, REVIEW, AND APPEAL

Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge. *See* Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-cv-186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).